CODY R. LEJEUNE (CSB NO. 249242)
cody@lejeunelawfirm.com
**LEJEUNE LAW, P.C.**
2801 Camino Del Rio South, Suite 200A
San Diego, CA 92108
Telephone: (985) 713-4964

Attorneys for Plaintiff,
VEDANTI LICENSING LIMITED, LLC

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VEDANTI LICENSING LIMITED, LLC, a California company, | Case No.: 3:20-cv-01344-BEN-WVG |
| Plaintiff, | **FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT** |
| v. | |
| GOOGLE LLC, a California company, (Formerly GOOGLE, INC.) owned by holding company Alphabet, Inc. and DOES 1-10, inclusive, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

Plaintiff Vedanti Licensing Limited, LLC ("VLL") files this First Amended Complaint for patent infringement against Defendant Google, LLC ("Google" or "Defendant") and alleges as follows:

## NATURE OF THE ACTION

1.      In the early 2000s, Apple, along with its iOS software and iPhone-leading hardware line, was firmly atop the internet video streaming world.

2.      At the time, Defendant Google's video streaming technology left it struggling to compete with the likes of Apple. Google's video streaming technology during this time resulted in buffering and customers waiting and waiting for videos to load. As a result, Google made a series of deceitful moves in an attempt to stay in the video streaming race with Apple – all of which violated numerous state and federal laws and can be summarized in one word: theft.

3.      First, in addition to the acquisition of YouTube in 2006, Google preyed on On2 Technologies ("On2"), whose VP8 and VP9 video streaming technology was touted to compete with and outperform the mainstream H.264 video streaming technology. After several failed attempts by Google to acquire On2, a February 2010 merger was challenged by On2 shareholders, who brought multiple lawsuits against Google, On2, and their directors and officers for trying to force a sale, that gave On2 shareholders pennies on the dollar, lacked independence and was replete with self-interest. The parties were working on a proposed settlement agreement in what had become a consolidated class action, but the proposed settlement was unanimously rejected in a May 5, 2016 decision by the New York Court of Appeals. To this day, Google has not remedied the gross deficiencies of the On2 failed merger attempt, with On2's valuable assets resulting in a financial windfall for Google and its officers and directors instead of the On2 shareholders.  The failed merger attempt is consequently is in jeopardy of being unwound and enjoined.

4.     Second, Google has admitted that, from the 2006 to 2010 timeframe, it developed its Android operating system without a license to Oracle's and Sun Microsystems' copywritten Java language's application programming interfaces ("APIs"). After it failed to come to terms regarding a license for Java, Google forged ahead and built its Android Operating System ("OS") by reproducing numerous key lines of the Java API source code into its Android source code.

5.     Third, Google stole Plaintiff's technology contained in U.S. Patent No. 7,974,339 ("the '339 Patent"). In March 2010, a month after the failed On2 merger attempt, Google held in-depth discussions with Plaintiff VLL regarding Plaintiff's video compression technology, which made videos load up to 33x faster than the then-current speeds. Google expressed its desire to acquire or take a license to Plaintiff's technology, and the parties signed a non-disclosure agreement. The parties then held extensive meetings over the course of several months.

6.     With promises of being acquired or having Google take a license to its technology, Plaintiff opened its vault by sharing its prized video transmission technology with Google, including its copyrightable source code (the "Vedanti Source Code") and the pending application that would lead to the '339 Patent.

7.     Instead of taking a license to the '339 Patent or acquiring the technology of the '339 Patent, however, Google instead opted to simply steal Plaintiff's technology contained in the Vedanti Source Code and the '339 Patent by incorporating it into its products and patent applications.

8.     Consistent with its actions regarding the Java source code, Google took the Vedanti Source Code and inserted it directly into its own VP8 source code. When Plaintiff met with Google in March 2010, Google's VP8 encoder source code contained approximately 621 lines of source code. By December 2010, after Plaintiff shared its source code with Google under a protective order, Google had inserted over 200 lines of the Vedanti Source Code into its VP8 encoder source code.

9.      Since March 2010, Defendant has incorporated the '339 Patent technology and the Vedanti Source Code into products made, used, sold, offered for sale, or imported, including, but not limited to, VP8, VP9, VPX, WebM, YouTube, Google Adsense, Google Play, Google TV, Chromebook, Google Drive, Google Chromecast, Google Play-per-view, Google Glasses, Google +, Google's Simplify, Google Maps and Google Earth.

10.      Defendant's infringement of the '339 Patent and the Vedanti Source Code is evident in virtually every website and product offered by Google and its subsidiaries.

11.      Tellingly, Google has recently removed the words "Don't be Evil" from its well-publicized Code of Conduct, as it has, whether via forceful acquisitions for pennies on the dollar or the theft of patented or copyrightable technology, in fact established a pattern of conduct which is the exact opposite.  Google has repeatedly willfully infringed the intellectual property and utilized the proprietary information of others without offering to compensate the owners.

12.      This case is yet another of the many occasions on which Google has illegally taken, rather than developed for itself or paid for, profitable technology that is core to the functioning of its many businesses and products.

13.      Based on the allegations contained herein, Plaintiff brings this specific case against Defendant for their willful infringement of the '339 Patent and the Vedanti Source Code.

## PARTIES

14.      Plaintiff VLL is a California LLC having its principal place of business at Torrey Reserve North Ct., 11622 El Camino Real, Suite 100, San Diego, California 92130.

15.      Google is a limited liability company organized under the laws of the State of Delaware and has a principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043.  Google is currently a subsidiary of Alphabet, Inc. and may be served through its registered agent for service of process at CSC – Lawyers

Incorporating Service, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California, 95833. In addition, Google has an office located at 6420 Sequence Dr., San Diego, California, 92121.

## JURISDICTION AND VENUE

16.     This Court has original and exclusive subject matter jurisdiction over this action under 28 U.S.C. §§1331 and 1338(a) because Plaintiff's claim of patent infringement, arises under the laws of the United States, including 35 U.S.C. §271.

17.     This Court has personal jurisdiction over Defendant because Defendant Google resides in this District, and Defendant has a continuous, systematic and substantial presence in this District, because they regularly conduct business and/or solicit business within this District, because they have committed and continue to commit patent infringement in this District, including without limitation by selling, offering for sale, and/or using Accused Instrumentalities (as defined below) in this District and by purposefully directing activities at residents of this District, by Defendant placing Accused Instrumentalities (as defined below) into the stream of commerce with the knowledge that they would be sold and used in California and this District, all of which acts form a substantial part of the events giving rise to Plaintiff's claims.

18.     This Court has personal jurisdiction over Google, as Google has conducted and does conduct business within the State of California and within this judicial district.

19.     Google, directly or through intermediaries, makes, distributes, offers for sale or license, sells or licenses, and advertises its products and services in the United States, the state of California, and the Southern District of California.

20.     Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400 because Defendant Google is registered as a limited liability company in California, does business, has infringed, and continues to infringe the '339 Patent and the Vedanti Source Code within this District, and this action arises from transactions of that business and that infringement. In addition, venue is proper because Plaintiff suffered harm in this District. Further, Google has a 60,000 square foot office in this district located at 6420 Sequence Dr., San Diego, California, 92121.

21.     Defendant makes, imports, uses, sells, and/or offers for sale the Accused Instrumentalities (as defined below) within the United States, including this District, that infringe one or more claims of United States Patent No. 7,974,339 entitled "Optimized Data Transmission System and Method" and the Vedanti Source Code. The '339 Patent was duly and legally issued by the United States Patent and Trademark Office on July 5, 2011.  A true and correct copy of the '339 Patent is attached hereto as Exhibit A.

22.     VLL is the owner by assignment of all rights, title, and interests in the '339 Patent and the Vedanti Source Code and is entitled to sue for past and future infringement thereof.

## FACTUAL BACKGROUND
### History of the '339 Patent

23.     In 2001, Constance Nash, one of the two named inventors of the '339 Patent, founded Vedanti Systems Ltd. ("VSL") with the goal of offering to the public an Internet subscription service to deliver digitized video of musical concerts via the Internet.

24.     After reviewing and testing numerous video compression and decompression technologies for use with the subscription services, Ms. Nash concluded that none of the then-existing video compression technologies could provide the level of video quality necessary to launch the project.

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

25.     The then-existing video standards resulted in jittery, low-quality video and sound for large-sized video files.

26.     The available technologies relied solely on compression, *i.e.*, the encoding of digital information by reducing the number of bits in the representation, either by identifying and eliminating statistical redundancy ("lossless" compression) or by identifying and deleting unnecessary bits ("lossy" compression).

27.     Ms. Nash hired Alex Krichevsky to work for VSL and together they developed the technology, specifically a video codec (the "VSL Codec"), and the inventions described in the '339 Patent.

28.     The VSL Codec implemented a proprietary and unique system of optimizing data transmission using methods for key frame partitioning, slicing and analyzing pixel variation of video content to significantly reduce the volume of digital video files, while minimizing any resulting loss of video quality.

29.     Ms. Nash and Mr. Krichevsky filed United States and numerous other international patent applications which covered some of the methods and systems utilized in the VSL Codec.

30.     Germane to this lawsuit, on January 16, 2002, Ms. Nash and Mr. Krichevsky filed the United States patent application which resulted in the issuance of the '339 Patent.

31.     In 2014, the '339 Patent was asserted against Google, YouTube and On2 in the Northern District of California, Case No. 5:14-cv-04412. In November 2015, that case was dismissed for lack of standing because the court ruled that the plaintiff lacked standing to bring the lawsuit. *See Id.,* at Dkt. No. 139 ("Order"). The factual background of that litigation, along with the court's position regarding standing, is set forth in detail in the Order.

32.     In September 2016, VSL and 100% of the rights, title and interest in the '339 Patent to was sold to Plaintiff VLL, the '339 Patent's current owner. VLL brings the current patent infringement lawsuit against Defendant.

1
2

**The '339 Patent at the PTAB**

3       33.     Defendant Google has filed two (2) separate *Inter Partes Review* ("IPR")
4  petitions in the USPTO before the Patent Trial and Appeal Board ("PTAB") against the
5  '339 Patent.

6       34.     Google filed the IPRs, Case IPR2016-00212 and Case IPR2016-00215, in
7  2016. After consolidating the two IPRs, the PTAB determined on May 17, 2017 that claims
8  1, 6, 7, 9, 10, 12, and 13 of the '339 Patent were unpatentable under 35 U.S.C. 103 over
9  the combination of the Spriggs and Golin references.

10      35.     However, the remaining claims of the '339 Patent – claims 2, 3, 4, 5, 8, and
11  11 – are still valid and enforceable today. Further, Google is estopped from instituting an
12  additional IPR to challenge the remaining, valid claims of the '339 Patent that it is willfully
13  infringing in all of its products that stream content.

14
15      **Google's History of Streaming Problems**

16      36.     In the mid to late 2000s, video compression and streaming technology was
17  an integral part of any major technology company.

18      37.     During this time, Apple became the leader in video delivery through its best-
19  in-class computers, iPods (media players), iPads (tablets) and iPhones (mobile devices).

20      38.     Defendant Google was far behind Apple, and its two major platforms,
21  YouTube video service and Android Mobile smart devices, streamed video at a much
22  slower rate than Apple's iOS operating system and hardware such as the iPhone.

23      39.     Google's products, including but not limited to the YouTube.com website,
24  the Chrome web browser, and the Android mobile device operating system, began
25  supporting a video compression standard (a "codec") known as H.264.

26
27
28

40.     The first version of the H.264 codec was completed in 2003 by a standardization committee called the Joint Video Team, which was formed by the Video Coding Experts Group and the Moving Pictures Experts Group.

41.     Since that time, H.264 has developed into a widely used codec with substantial penetration in the optical disc, broadcast, and streaming video markets.

42.     MPEG LA, LLC is a firm based in Colorado that licenses patent pools that cover essential patents necessary for use in various video codec standards.  MPEG LA is not related to the Moving Pictures Experts Group.

43.     MPEG LA was initially founded in 1996 by several international companies that owned patents necessary to practice the MPEG-2 video standard in order to pool those patents under a single entity for purposes of granting pooled licenses to those patents and to generate patent royalties.

44.     Since that time, MPEG LA has asserted that multiple video standards, including H.264, require a license to its pooled patents, and hundreds of companies have obtained licenses from MPEG LA for the rights to the H.264 patent pool.

45.     For many years Google refused to obtain a license from MPEG LA to cover its implementations of the H.264 standard despite multiple requests from MPEG LA that Google required a license.

46.     Thus, the H.264 standard presented Google with two problems – (1) it did not want to take a license for the technology and pay royalties to MPEG LA; and (2) even if it did, the H.264 technology could not compete with leaders in the industry such as Apple. Accordingly, Google sought an alternative to H.264.

**Google's Failed Merger with On2 Technologies**

47.     That alternative was VP8 and then subsequently VP9 and VPX. VP8 is a video compression standard released by a company named On2 Technologies in September 2008.

48.     As of September 2008, MPEG LA had not established a patent pool that covered the VP8 codec.

49.     In August 2009, Google targeted VP8 as a potential alternative to H.264 and initiated negotiations to acquire On2.

50.     However, Google's failed merger attempt with On2 started with problems that Google still has not cured to this day.

51.     Google's first attempt to acquire On2, via merger, failed as it only offered $106.5 million of Google stock and the shareholders voted against the deal. In February 2010, Google seemed to complete the acquisition of On2 wherein it appeared that Google had obtained On2's valuable video ecosystem technology, coding and patents for $133.9 million – approximately 10% of its value at the time.

52.     Several class action lawsuits that alleged breaches of fiduciary duty of care and loyalty were filed against Google, On2 and their directors and officers in response to the merger. The lawsuits alleged that On2's directors and officers, including those now holding top level executive positions at Google, including Matthew Frost and Timothy Reusing, aided and abetted, and with the help of Google, breached their fiduciary duties of care and loyalty to the On2 shareholders in connection with the merger.

53.     The merger left the On2 shareholders empty-handed and resulted in a technological and financial windfall for Google and for executives such as Frost and Reusing.

54.     Sundar Pichai, who was then the Vice President of Product Management at Google and is now the CEO of Google's parent, Alphabet, Inc., stated that he "believe[d] On2's engineering talent and technology will be an incredible asset for us as we work to improve this platform." However, the On2 merger was only valued at approximately $133.9 million which was approximately 10% of its value at that time in 2010.

55.     As but one example of the total lack of independence and self-interest surrounding the On2 merger, Matthew Frost, a Director at Google, was a named defendant

in related securities fraud litigations, and is now Vice President of Communications and Membership for the Alliance for Open Media ("AOMedia") which shares all of the willfully infringed technology of the '339 patent, the Vedanti Source Code, the On2 operating system and Sun's Java source code.

56.     Google was unable to reach a settlement regarding the class actions, because the court required them to send notice and obtain approval of the Settlement Offer to the 21,000+ shareholders of On2 Technologies, which Google never did.

57.     On September 27, 2010, approximately 226 On2 shareholders filed objections to the settlement offer because it sought to improperly bind On2 shareholders as out-of-state residents, it was neither fair nor adequate, and it did not provide an opportunity for On2 shareholders to opt out of the proposed settlement offer to bring their own, individual action against On2 and its executives.

58.     The court agreed with the objecting shareholders and rejected the settlement offer because it did not provide for an opt-out right for non-New York class members. Consistent with the United States Constitution and a court order, non-New York class members could not be bound by the settlement. Instead of acting to finalize or consummate the proposed settlement, Google appealed the court's order in October 2012.

59.     New York's Appellate Division affirmed the lower court's order, and Google appealed to New York's highest court, the New York Court of Appeals.

60.     On May 5, 2016, the New York Court of Appeals affirmed the order and judgment of the Appellate Division without dissent, rejecting the settlement offer because it sought to bind class members with no ties to New York State to a settlement that purported to extinguish its rights to bring an action in damages in another state.

61.     Specifically, the New York Court of Appeals held the following:

"While the complaint seeks predominately equitable relief, the settlement would also release any damage claims relating to the merger by out-of-state class members. The broad release encompassed in the agreement bars the right of those class members to pursue claims not equitable in nature, which…are constitutionally protected property rights.

10

> Notably, the settlement here…impinges on the right of out-of-state class members to pursue any and all claims for damages relating to the merger, not only claims that may be considered identical."

New York Court of Appeals, May 5, 2016, Dkt. No. 64, at 4, 7.

62.     Google's time to file a petition for a writ of *certiorari* with the United States Supreme Court expired in August 2016.

63.     To this date, Google has not remedied the substantive deficiency of the proposed settlement, and Google never achieved final approval of the settlement with the Court.

64.     Despite never receiving final approval of the settlement, Google has nonetheless operated as though the O2 merger was finally approved, much to the extreme detriment of On2 shareholders. Google's pretending that the merger with On2 was a success, when it was not, enabled it to falsely obtain possession of the valuable assets including the VP8, VP9 and VPX codec and On2's patents and pending patent applications covering the VP8 codec.

65.     In May 2010, Google announced that its new WebM video file format would incorporate the VP8 codec.

66.     YouTube utilized WebM video and encoded its entire portfolio of videos to WebM.  WebM was enabled in Google Android operating system in late 2010.

67.     After the release of WebM/VP8 by Google, however, numerous reviews by the public concluded that the video quality of WebM/VP8 was significantly weaker than the quality produced by H.264.

68.     Accordingly, Google began discussions with Plaintiff regarding the technology disclosed in the '339 Patent.

**Google Copied the Java Platform Source Code to Build Android OS**

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

69.     Looking to further stack its video ecosystem, Google looked to the Java software platform that was developed by Sun Microsystems and then acquired by Oracle Corporation.

70.     In 2005, Google negotiated with Sun Microsystems for a license to use the Java API for its mobile devices, but the parties were unable to reach a deal.

71.     As a result, Google replicated the structure, sequence, and organization of the overall code for 37 Java API packages, which performs fundamental computing operations such as mathematical computations, file and string manipulations, and database connectivity.

72.     Indeed, Google chose not to take a license and instead knowingly stole the source code from Oracle's Java platform and inserted the Java source code lines into its Android operating system.

73.     In well-documented court proceedings and documents, Google admitted that its implementation of the Android OS used the same names, organization, and functionality as the Java APIs.

74.     Thus, Google developed its Android OS by copying the methods contained in the 37 Java API packages.

## Google Stole the Technology in Plaintiff's '339 Patent

75.     In March 2010, with the understanding that WebM/VP8 was in desperate need of improvement, Alpesh Patel, VSL's CEO at that time, communicated with Google to discuss taking a license to the '339 Patent and/or the possible acquisition of Plaintiff and the '339 Patent by Google.

76.     In April 2010, Mr. Patel and Megan Smith, Google's Vice President of New Business Development, executed a non-disclosure agreement ("NDA") stating that the purpose of seeing Plaintiff's confidential technology was to pursue a business relationship and only use the disclosed information for the intended purpose.

77.     During those negotiations, Laura Majerus, one of Google's in-house counsel, advised that if Plaintiff's patent portfolio read on the H.264 video codec, then Google would seek to buy the technology or acquire VSL.

78.     During the course of the negotiations and pursuant to the NDA, Plaintiff provided a working VSL codec contained within the Vedanti Source Code, to Google for testing and analysis and further provided copies of Plaintiff's patents, patent applications (including the patent application that lead to the '339 Patent), and claim charts comparing the inventions claimed in the '339 Patent to the H.264 standard.

79.     The parties continued to meet over the course of the next eight months. During the course of those meetings, Google requested, and Plaintiff provided, technical guidance to Google regarding the implementation of its technology, the Vedanti Source Code, and the inventions claimed in the '339 Patent.

80.     By December 2010, after Google had implemented all of Plaintiff's proprietary technology, Defendant arbitrarily terminated discussions after stating that they had no interest in anything presented to that point.

81.     However, Google got exactly what it wanted from Plaintiff. Similar to its actions previously when it copied the Java source code directly into its Android Operating System source code, Google copied 200+ lines of the Vedanti Source Code into its VP8 encoder source code.

82.     In June 2010, Google's VP8 encoder source code contained 621 lines of source code. By December 2010, Google had taken the Vedanti Source Code and inserted it directly into its VP8 source code, bringing it to a total of 827 lines.

83.     A side-by-side comparison of the June 2010 version of Google's VP8 encoder source code on the left and the December 2010 version on right, is below:

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

84.    On December 16, 2010, Ms. Majerus shipped materials back to Plaintiff that Plaintiff had provided to Google pursuant to the NDA.  Ms. Majerus included a cover letter that provided an itemized list of documents and other things being returned to Plaintiff pursuant to the NDA.

85.    Ms. Majerus did not include the claim charts comparing the inventions claimed in the '339 Patent to the H.264 standard.

86.     However, Ms. Majerus did include a collection of twenty-three (23) yellow Post-It notes written in blue ink as part of the property belonging to VSL.

87.     The Post-It notes included statements that outline Google's plan to willfully infringe the '339 Patent, which violated the NDA executed by the parties.

88.     The Post-It notes are publicly available and can be found on the internet, including at the following link - valleywag.gawker.com/source-these-post-its-show-google-scheming-to-steal-tr-1640358982 – where they have been since September 29, 2014. *See* Exhibit B, attached hereto. When a Google search for "Vedanti google post-it notes" is performed, the first hit is the Gawker article. *See* Exhibit C, attached hereto.

89.     Examples of the Post-It notes include the following:

a.     Google engineers should be discouraged from "digging deep" and should "close eyes to existing IP";

b.     Google was concerned that its infringement could be considered "recklessness" (the standard applicable to willful infringement);

c.     Google has concerns that products in development should be carefully monitored because of potential infringement;



d.   Google personnel should "try" to destroy incriminating emails;

e.   Google needed to obtain a non-infringement opinion from outside counsel;



quoted 102(b)

Draw line at engrs
doing more research

- Ask for OC opinion,
- Try to destroy email,
non-infrg memo opin $5
regular   $15K

    f.     Google should evaluate the risk of getting sued for infringement if Google's infringing products are "money making"; and

Design around
Lic/Risk of Lit

what if prods are
money-making,

    g.     Google should consider a "design around" because it is facing a "risk of litigation."

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

90.     Clearly, when it came to deciding on a course of action with regard to dealing with infringing patented technology, Google's first choice was to infringe the patent; its second choice was to invalidate the patent; its third choice was to design around the patent; and then and only then would Google seek to take a license to the patented technology.

91.     But Google has been able to invalidate patents at an alarming rate before the USPTO and the PTAB with the former Chief Patent Officer and creator of its Patent Program from Google's inception, Michelle Kwok Lee, serving as Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office from 2013 to 2017.

92.     Consistent with this playbook, Google immediately implemented its patent infringement plan as it began to incorporate Plaintiff's patented technology into WebM/VP8 and VP9 soon after it initiated negotiations with Plaintiff and received Plaintiff's confidential information regarding its technology.

19

93.     Subsequent to meeting with Plaintiff, Google and On2 either amended a number of their pending patent applications to incorporate various claims of the '339 Patent or filed for new patents which incorporated various claims of the '339 Patent, without disclosing to the United States Patent and Trademark Office the '339 Patent or its underlying application as prior art or Ms. Nash or Mr. Krichevsky as prior inventors.

94.     In addition, Google has incorporated the technology from the '339 Patent into many of its subsequently-filed patent applications. Two examples include U.S. Patent Nos. 8,320,445 and 8,693,547, as shown below:



95.     Nonetheless, Defendant's incorporation of claims of the '339 Patent into their patent applications and patents constitute tacit admissions of Defendant's infringement of the '339 Patent.

## The Accused Instrumentalities

96.     As detailed above, Defendant is engaged in the business of developing, using, and selling a variety of video computer programs, including those commonly referred to as the VP8, VP9, VPX, H.264, and WebM video codecs (collectively the "Accused Codec Instrumentalities").  Defendant embedded these Accused Codec Instrumentalities in other products that Defendant makes, uses, and sells, including in this District, such as the Android operating system used in many mobile phones and tablet computers (collectively "the Accused Android Instrumentalities").

97.     Defendant uses these Accused Codec Instrumentalities to deliver video content from Defendant's websites and products such as VP8, VP9, VPX, WebM,

YouTube.com, the YouTube application, Google Adsense, Google Play, Google TV, Chromebook, Google Drive, Google Chromecast, Google Play-per-view, Google Glasses, Google +, Google's Simplify, Google Maps and Google Earth (collectively the "Accused Website and Product Instrumentalities").

98.     Defendant distributes software such as the Chrome web browser that implements the Accused Codec Instrumentalities (collectively the "Accused Software Instrumentalities").

99.     Collectively, the Accused Codec Instrumentalities, the Accused Android Instrumentalities, the Accused Website and Product Instrumentalities, and the Accused Software Instrumentalities comprise the "Accused Instrumentalities."

## COUNT I

### (Infringement of the '339 Patent)

100.    Plaintiff realleges and incorporates by reference the allegations contained in all paragraphs of this Complaint above as though fully set forth herein.

101.    Defendant has been and now is directly infringing one or more claims of the '339 Patent by making, importing, using (including use for testing purposes), offering for sale, and/or selling the patented inventions, including but not limited to the Accused Instrumentalities.

102.    Defendant has been and/or now is indirectly infringing one or more claims of the '339 Patent by inducing customers, consumers, and end users to use the Accused Instrumentalities to directly infringe one or more claims of the '339 Patent in violation of 35 U.S.C. § 271(b).

103.    Specifically, the Accused Instrumentalities infringe at least six claims of the '339 Patent as indicated in the attached claim chart, Exhibit C, which is incorporated herein.

104.   This infringement chart is based on Plaintiff's current understanding of the Accused Instrumentalities, which only considers publicly available information. The chart does not set forth all of Plaintiff's infringement theories – the Accused Instrumentalities embody other claims set forth in the '339 Patent.

105.   Plaintiff reserves the right to amend or supplement its infringement theories upon more information becoming available through formal discovery and/or this Court completing its claim construction proceedings. Pursuant to Patent Local Rule 3.1, Plaintiff will serve a Disclosure of Asserted Claims and Infringement Contentions at the appropriate time that may alter and/or supplement the infringement chart submitted herewith.

106.   Google was informed in 2010 of the pending application that became the '339 Patent and had actual knowledge of the applicability of the inventions claimed therein to video codecs such as those used in the Accused Instrumentalities.

107.   Furthermore, Google has been provided actual notice of the existence of the '339 Patent.

108.   The Post-It notes are unequivocal evidence of Google's knowledge of the '339 Patent and subsequent willful infringement by Defendant.

109.   Despite having received such notice, Defendant has intended, and continues to intend, to induce patent infringement by customers and end users, and has had knowledge that the inducing acts would cause infringement or, alternatively, has been willfully blind to the possibility that its inducing acts would cause infringement.

110.   The Accused Instrumentalities comprise the systems claimed in one or more claims of the '339 Patent, and when used as described in Defendant's technical publications, perform the method(s) described and claimed in the '339 Patent.

111.   Defendant engages in indirect infringement by providing its customers and end users with the infringing Accused Instrumentalities, and/or by providing the Accused Instrumentalities and providing instructions to enable those customers and end users to use the Accused Instrumentalities, each of which constitute the system claimed in one or more

claims of the '339 Patent, and/or to utilize the Accused Instrumentalities so as to practice the method claimed in one or more claims of the '339 Patent.

112.   By way of example, and not as a limitation, Defendant induces such infringement by at least making its Internet websites available to customers and end users and providing links and/or other directions on its websites and/or the Internet to instruct and teach users to use the Accused Instrumentalities in an infringing manner.

113.   Defendant engages in such activities knowingly and as early as 2010 have done so with the knowledge that such activities induce customers and end users to directly infringe the '339 Patent.

114.   In addition, or, in the alternative, Defendant engages in such activities knowingly, and as early as 2010, have sold or distributed the Accused Instrumentalities knowing that such Accused Instrumentalities are especially made or adapted for use by their customers and end users in an infringing use of one or more claims of the Accused Instrumentalities.

115.   On information and belief, Defendant's customers and end users configure the Accused Instrumentalities to encode and/or decode digital video as described and claimed in the '339 Patent.   Thus, Defendant's customers and end users, by using the Accused Instrumentalities, directly infringe the claimed method(s) of the '339 Patent.

116.   Plaintiff has been damaged by Defendant's infringing activities and will be irreparably harmed unless those infringing activities are preliminarily and permanently enjoined by this Court.   Plaintiff does not have an adequate remedy at law.

117.   Google either had actual knowledge of the '339 Patent or recklessly disregarded the existence of the '339 Patent, so Plaintiff is entitled to damages against Google for indirect infringement for the period prior to the filing of this Complaint to the date of trial.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff requests the following relief:

(a)      A judgment in favor of Plaintiff that Defendant has directly infringed, and/or has indirectly infringed by way of inducement, one or more claims of the '339 Patent and that such infringement has been willful;

(b)      A judgment that Plaintiff has been irreparably harmed by the Defendant's infringing activities and are likely to continue to be irreparably harmed by Google's continued infringement;

(c)      Preliminary and permanent injunctions prohibiting Defendant and its officers, agents, servants, employees, and those persons in active concert or participation with any of them, as well as all successors or assignees of the interests or assets related to the Accused Instrumentalities, from further infringement, direct and indirect, of the '339 Patent;

(d)      A judgment and order requiring Defendant to pay Plaintiff damages adequate to compensate for infringement under 35 U.S.C. §284, which damages may include lost profits but in no event shall be less than a reasonable royalty for the use made of the inventions of the '339 Patent, including pre- and post-judgment interest and costs, including expenses and disbursements;

(e)      A judgment awarding treble damages to Plaintiff pursuant to 35 U.S.C. § 284, in view of the willful and deliberate nature of the infringement, with interest;

(f)      A judgment declaring this to be an exceptional case under 35 U.S.C. § 285 and awarding Plaintiff its attorneys' fees under 17 U.S.C. §505;

(g)      Pre- and post-judgment interest as permitted by law; and

(h)      Any and all such further necessary or proper relief as this Court may deem just.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury of all issues so triable.

Respectfully submitted,
**LEJEUNE LAW, P.C.**

Dated: September 29, 2020      By:   _/s/_ Cody R. LeJeune

Cody R. LeJeune
2801 Camino Del Rio South, Suite 200A
San Diego, California 92108
Telephone: (985) 713-4964

Attorneys for Plaintiff
VEDANTI LICENSING LIMITED, LLC

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT